IN THE UNITED STATES BANKRUPTCY COURT
FOR THE NORTHERN DISTRICT OF OKLAHOMA

IN RE:

ROBERT D. KENNEY and CHERYL A. KENNEY,

          Debtors.

Filed / Docketed
December 22, 2008

Case No. 07-12153-M
Chapter 13

## MEMORANDUM OPINION

The dispute presently before the Court deals with the measure of disposable income and the amount of payments to be made under a Chapter 13 plan. Debtors have made over $23,000 in payments to the Chapter 13 Trustee since this case was filed. Their previous plans earmarked a significant portion of those monies to pay a claim secured by a first mortgage on the debtors' home. Debtors have now decided to surrender the home. They also wish to *retroactively* reduce their first four plan payments, and apply the difference to plan payments not yet due. The question is whether the law allows them to do so. The following findings of fact and conclusions of law are made pursuant to Federal Rule of Bankruptcy Procedure 7052, made applicable to this contested matter by Federal Rule of Bankruptcy Procedure 9014.

### Jurisdiction

This Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334(b), and venue is proper pursuant to 28 U.S.C. § 1409.[1] Reference to the Court of this matter is proper pursuant to 28 U.S.C. § 157(a). This is a core proceeding as contemplated by 28 U.S.C. § 157(b)(2)(L).

---

[1] Unless otherwise noted, all statutory references are to sections of the United States Bankruptcy Code, 11 U.S.C. § 101 *et seq.* (West 2008). All other references to federal statutes and rules are also to West 2008 publications.

**Findings of Fact**

Robert D. Kenney and Cheryl A. Kenney ("Debtors") filed an original petition for relief under Chapter 13 of the Bankruptcy Code on November 1, 2007. In their schedules, Debtors listed monthly income of $4,322.32, and expenses (exclusive of home mortgage payments) of $1,602.[2] Debtors' income is above the Oklahoma median income for a family of their size. Debtors also filed a statement of current monthly income and calculation of disposable income ("Form B22C").[3] The Form B22C calculation utilizes certain standard deductions for expenses.[4] According to the Form B22C calculations, Debtors had no monthly disposable income.[5]

One of the assets scheduled by the Debtors was their residence located in Glenpool, Oklahoma (the "Residence"). According to the schedules, the Residence had a value of $150,000, and was subject to a first mortgage lien held by Countrywide Home Loans, Inc. ("Countrywide") in the amount of $138,384.82. A proof of claim in the amount of $133,301.40 was filed by "Deutsche Bank National Trust Company as Trustee for the Holders of GSAMP Trust 2004-AR2, Mortgage Pass-Through Certificates, Series 2004-AR2."[6] About November 30, 2007, Countrywide

---

[2] *Docket No. 1* at 30–33.

[3] *Docket No. 2.*

[4] Form B22C requires the use of certain standard deductions outlined in § 707(b)(2). These deductions often do not reflect a debtor's actual expenses.

[5] The Form B22C calculations suggested a <u>negative</u> monthly disposable income of $1,015.58.

[6] *See Claim No. 9-1.* The relationship between Deutsche Bank and Countrywide is not clear. For purposes of this decision, the ownership of the indebtedness is not in dispute. As a matter of convenience, the lender will be referred to as "Countrywide."

filed an Arrearage Proof of Claim stating the arrearage claim on the Residence to be $16,419.06,[7] some $6,419.06 more than the amount estimated by the Debtors. The original proof of claim filed by Countrywide called for a monthly payment of $1,324.54; however, Countrywide filed an Amended Proof of Claim showing a required monthly mortgage payment of $1,574.03 beginning on January 1, 2008.[8]

The original Chapter 13 Plan provided for a plan payment of $2,380 per month for 60 months. Out of this payment, the plan called for monthly payments to Countrywide of $1,500 for the term of the plan, plus additional pre- and post-petition arrearages to be paid in months 11 through 60.[9] As a result of the higher than anticipated arrearage claim, in order for Debtors to retain the Residence, the plan payment would need to increase to $2,461 in the second month of the plan and to $2,566 per month thereafter. Debtors determined that they were unable to afford the increased payments.

On June 13, 2008, the Debtors filed their Third Amended Chapter 13 Plan, which called for the surrender of the Residence to Countrywide and retroactively reduced their Chapter 13 Plan payment to $690 per month.[10] The Fourth Amended Chapter 13 Plan (the "Fourth Plan") was filed on June 17, 2008, to correct a scrivener's error.[11] Debtors project that unsecured creditors will receive approximately ten per cent of their claims under the Fourth Plan. Payments under the Fourth

---

[7] *See Claim No. 10-1.*

[8] *See Claim No. 9-2.*

[9] *See Docket No. 6.*

[10] *Docket No. 64.* Debtors have since vacated the Residence. *See Docket No. 91.*

[11] *Docket No. 66.*

3

Plan were to commence on December 1, 2007, 30 days after the filing of the bankruptcy case.[12]

Debtors have made all plan payments required to date under the Fourth Plan. They paid $2,380 in month one, $2,566 in month two, $2,635 in months three and four, and $690 each month thereafter. As of September 8, 2008, the Debtors had paid a total of $23,374.50 to the Chapter 13 Trustee. Debtors propose that these funds be applied to the monthly payments of $690 due under the Fourth Plan, the effect of which would be to "pre-pay" several of the monthly installments due under the Fourth Plan.[13]

The Fourth Plan is presently before the Court for confirmation. Lonnie D. Eck, the Standing Chapter 13 Trustee (the "Trustee"), has objected to the Fourth Plan on the basis that

> The Plan Payment section should be amended to reflect the actual disposable income in Months 1 through 7. These amounts have already been paid into the Plan. The payment schedule should be $2,380.00 for Month 1; $2,566.00 for Month 2, $2,635.00 for Months 3 and 4; and $690.00 thereafter.[14]

The Trustee sought to expand the basis for his objection to confirmation by amending his original objection.[15] Debtors have objected to the amendment as untimely.[16] The Court shall consider the Trustee's objection in its original form, and reach the issues raised by the amendment to the

---

[12] As a matter of law, a Chapter 13 debtor must begin making payments under the terms of his or her proposed plan(s) "not later than 30 days after the date of the filing of the plan or the order for relief, whichever is earlier. . . ." § 1326(a)(1). Therefore, when a debtor files multiple plans, the date payments must commence ordinarily remains unchanged.

[13] The parties have stipulated that Debtors have paid the Trustee the sum of $23,374.50 as of September 8, 2008. This amount is roughly equivalent to 34 monthly payments of $690. Debtor's first plan payment under the Fourth Plan was due on December 1, 2007. Debtors' proposal would result in an eleven month pre-payment of the amounts due under the Fourth Plan.

[14] *Docket No. 69*.

[15] *Docket No. 77*.

[16] *Docket No. 78.*

4

objection (including the timing of the amendment) only if necessary.

To the extent the "Conclusions of Law" contain any items which should more appropriately be considered "Findings of Fact," such items are incorporated herein by this reference.

## Conclusions of Law

Section 1325(b)(1) provides that

> If the trustee or the holder of an allowed unsecured claim objects to the confirmation of the plan, then the court may not approve the plan unless, as of the effective date of the plan—
>
> > (A) the value of the property to be distributed under the plan on account of such claim is not less than the amount of such claim; or
> >
> > (B) the plan provides that all of the debtor's projected disposable income to be received in the applicable commitment period beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan.[17]

In this case, unsecured creditors are projected to receive ten per cent of their claims, thus rendering § 1325(b)(1)(A) inapplicable. The question is whether the Fourth Plan, which purports to reduce the amount of plan payments already made, "provides that all of the debtor's projected disposable income . . . beginning on the date that the first payment is due under the plan will be applied to make payments to unsecured creditors under the plan." The interesting twist is that, in determining "projected" disposable income, we are not dealing with what might happen in the future: instead, Debtors are trying to reconfigure past events.

One thing is certain: "projected disposable income" for purposes of § 1325(b)(1)(B) does not necessarily equate to a debtor's "monthly disposable income" under Form B22C. This issue was

---

[17] § 1325(b)(1).

recently resolved by the United States Court of Appeals for the Tenth Circuit in *In re Lanning*.[18] In *Lanning*, the court rejected the "mechanical" approach to determining disposable income, which merely looks at the disposable income calculation contained in Form B22C. The *Lanning* court adopted what is known as the "forward-looking" approach, which allows a court to "adjust the 'monthly disposable income' calculated on Form B22C to account for a debtor's actual ability to fund a plan as of the effective date of the plan."[19] The court expressly held that

> as to the income side of the § 1325(b)(1)(B) inquiry, the starting point for calculating a Chapter 13 debtor's "projected disposable income" is presumed to be the debtor's "current monthly income," as defined in 11 U.S.C. § 101(10A)(A)(i), subject to a showing of a substantial change in circumstances.[20]

A majority of other courts faced with the issue have reached the same conclusion.[21] The driving force behind the "forward-looking approach" is the belief that Congress intended that a debtor "repay creditors the maximum [they] can afford–no more and no less."[22]

Debtors made payments to the Trustee of $2,380, $2,566, $2,635, and $2,635 in the first four months of their case. These are not projected payments: they reflect the Debtors' "actual ability to fund a plan." A large portion of these payments was earmarked for Countrywide under prior plans. Countrywide was not paid anything: instead, the money went to the Trustee, and the net result is

---

[18] 545 F.3d 1269 (10th Cir. 2008).

[19] *Id.* at 1274-75.

[20] *Id.* at 1282.

[21] In addition to the cases cited in *Lanning*, see *In re Frederickson*, 545 F.3d 652 (8th Cir. 2008), and *In re Petro*, 395 B.R. 369 (6th Cir. BAP 2008).

[22] *In re Lanning*, 545 F.3d at 1281. *See also In re Kibbe*, 361 B.R. 302, 314 (1st Cir. BAP 2007).

that the Debtors effectively had no housing expense during the first four months of their case.[23] Since Debtors had the money to make these four payments, and did not require it for maintenance, support, charitable contributions, or business expenses,[24] the money paid to the Trustee during the first four months of the case constitutes disposable income.

The Fourth Plan seeks to retroactively reduce the Debtors' plan obligations during the first four months of the case to $690, and to continue monthly payments of $690 thereafter. Ostensibly, the reduction in the plan payment is necessary in order for the Debtors to pay for housing, since they are no longer living in the Residence. While prospective reduction in plan payments might be reasonable, the reduction of plan payments in the first four months of this case is a fiction. Those payments have already been made, and the funds were not required in order to provide housing for the Debtors. The effect of the Fourth Plan is to allow the Debtors to pay less than their disposable income over the term of the Fourth Plan. The Fourth Plan is not rooted in reality, fails the test under § 1325(b)(1)(B), and would allow Debtors to pay their creditors less than the maximum they can afford. As such, it cannot be confirmed.

The Court also considers whether the Fourth Plan complies with § 1325(a)(3), which requires that a plan be "proposed in good faith and not by any means forbidden by law[.]"[25] "Good faith is

---

[23] The Court makes no finding regarding whether Countrywide is entitled to any payments for the period when Debtors lived in the Residence post-petition. The Court notes that Countrywide was not entitled to adequate protection under the provisions of § 1326(a)(1)(C), and never sought an order of adequate protection from the Court, but instead sought and obtained relief from the automatic stay so that it could foreclose its lien on the Residence. *See Docket Nos. 83 and 90*. For a discussion as to when a creditor is entitled to adequate protection, see *In re Lively*, 266 B.R. 209 (Bankr. N.D. Okla. 1998).

[24] *See* § 1325(b)(2).

[25] § 1325(a)(3).

evaluated on a 'case-by-case basis' by examining the totality of the circumstances."[26] The proponent of the Chapter 13 plan bears the burden of proof as to all issues relating to plan confirmation, including the issue of good faith.[27] In every Chapter 13 case, the court has an independent duty to assess whether a plan was proposed in good faith.[28]

One of the factors to be considered in evaluating the good faith behind a plan is "the amount of the proposed payments and the amount of the debtor's surplus."[29] In this case, the Fourth Plan calls for payments of $690 per month, commencing in the first month. In fact, Debtors had far more disposable income in the first four months of the case, as evidenced by the sums actually paid to the Trustee. This disposable income must be paid to creditors under the plan. Debtors' failure to do so supports a finding that the Fourth Plan has not been filed in good faith, and the Court so finds.

Debtors argue that the Fourth Plan was filed in good faith because it "represents a plan that could have been filed at the outset of this bankruptcy case and confirmed without issue."[30] The statement is incorrect. The Debtors had monthly disposable income of $2,380, $2,566, $2,635, and $2,635 during the first four months of their case.[31] Had they proposed a plan that provided for monthly payments of $690 during those months, and had the Trustee or an unsecured creditor

---

[26] *In re Alexander*, 363 B.R. 917, 923 (10th Cir. BAP 2007) (citations omitted).

[27] *See In re Maras*, 226 B.R. 696, 701 (Bankr. E.D. Okla. 1998) (citations omitted).

[28] *See In re Henricksen*, 131 B.R. 467, 468 (Bankr. N.D. Okla. 1991).

[29] *Flygare v. Boulden (In re Flygare)*, 709 F.2d 1344, 1347 (10th Cir. 1983) (quoting *In re Estus*, 695 F.2d 311, 317 (8th Cir. 1982)).

[30] *Docket No. 81* at 6 (emphasis deleted).

[31] Admittedly, this large amount of disposable income exists because Countrywide allowed the Debtors to live in the Residence without making payments to Countrywide during the first four months of the case or obtaining an order requiring adequate protection.

objected, the plan could not have been confirmed, as it would have been in direct violation of § 1325(b)(1)(B). The fact that Debtors later chose to surrender the Residence is irrelevant. During the first four months of the case, the Debtors lived in the Residence. Payments to Countrywide were to be made under the first three plans that the Debtors proposed. Now that Debtors have vacated the Residence, they are not entitled to recoup the payments that they originally intended for Countrywide for their own personal benefit. Those payments constitute disposable income, and cannot be used by the Debtors in an effort to prepay their plan obligations.

## Conclusion

The Fourth Plan does not comply with § 1325(b)(1)(B), and has not been proposed in good faith. It is not confirmed. Denial of confirmation of the Fourth Plan renders moot all disputes regarding the ability of the Chapter 13 Trustee to amend his objection to confirmation. Debtors shall be given leave to file an amended plan consistent with the Court's decision.

A separate order consistent with this Memorandum Opinion is entered concurrently herewith.

Dated this 22nd day of December, 2008.

BY THE COURT:

TERRENCE L. MICHAEL
UNITED STATES BANKRUPTCY JUDGE

5409.4